UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

---

ASSURED GUARANTY CORP. and ASSURED
GUARANTY MUNICIPAL CORP.,

                                    Movants,

            -against-

COMMONWEALTH OF PUERTO RICO, PUERTO RICO
HIGHWAYS AND TRANSPORTATION AUTHORITY,
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
RICO, ALEJANDRO GARCÍA PADILLA, CARMEN
VILLAR PRADOS, MELBA ACOSTA FEBO, JUAN C.
ZARAGOZA GÓMEZ, and JOHN DOES 1-4,

                                    Respondents.

No. 16-cv-_____

---

## EMERGENCY MOTION OF ASSURED GUARANTY CORP. AND ASSURED GUARANTY MUNICIPAL CORP. FOR RELIEF FROM THE PROMESA STAY

**TO THE HONORABLE COURT:**

Movants Assured Guaranty Corp. ("AGC") and Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc. ("AGM" and, together with AGC, "Assured" or "Movants"), by their attorneys Casellas Alcover & Burgos P.S.C. and Cadwalader, Wickersham & Taft LLP, respectfully state and pray as follows:

### INTRODUCTION

Movants AGC and AGM issued insurance policies that guarantee payments on bonds issued by Respondent Puerto Rico Highways and Transportation Authority ("PRHTA"). The Governor's Administrative Bulletins No. OE-2016-18, EO-2016-30, and EO-2016-31 (collectively, the "Emergency Orders") unlawfully divert PRHTA toll revenues pledged to secure those bonds and unlawfully provide that PRHTA may use such pledged toll revenues to (i) pay expenses of its own operations that are subordinate to the bonds and (ii) fund "essential

services" on behalf of the government of the Commonwealth of Puerto Rico (the "Commonwealth"), which "essential services" remarkably are defined to include payments to financially-distressed Respondent the Government Development Bank for Puerto Rico ("GDB").

This unlawful diversion of secured bondholder collateral is preempted and prohibited by the Bankruptcy Code and by several provisions of the recently-enacted Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016) (to be codified at 48 U.S.C. § 2101 et seq.) ("PROMESA").  The diversion violates the U.S. Constitution, the Commonwealth Constitution, and Puerto Rico law, in further violation of PROMESA.  Due to the distressed financial condition of PRHTA, the Commonwealth, and GDB, if the stay imposed by Section 405(b) of PROMESA is not lifted and the diversion of collateral is not enjoined, the pledged toll revenues diverted pursuant to these executive orders will never be recovered and Movants will suffer irreparable damage.  Therefore, Movants request that the Court (i) grant emergency relief from the PROMESA stay under Section 405(g) of PROMESA to the extent necessary to prevent irreparable damage to Movants' interest in the PRHTA toll revenues, and (ii) enter an order, substantially in the form of the proposed order (the "Proposed Order") attached hereto as Exhibit A, granting relief from the PROMESA stay under Section 405(e)(2) of PROMESA for the purposes of permitting Movants to file a complaint substantially in the form of the proposed complaint (the "Proposed Complaint") attached hereto as Exhibit B and to prosecute the resulting action.

## BACKGROUND

### I.    Movants Insure Bonds Issued By PRHTA

Movants provide financial guaranty insurance, which guarantees scheduled payments of interest and principal on a bond or other obligation.  Under relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by

Movants entitles them to receive the payments due on the bonds, which continue to remain payable by the municipal issuer.  In effect, by paying the bondholders on behalf of the municipal issuer, Movants step into the shoes of the bondholders and the municipal issuer remains liable for the full amount of the payment made by Movants to the bondholders.

## II.    **The PRHTA Bonds**

Respondent PRHTA is a public corporation created by Act No. 74-1965 (the "Enabling Act") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico.  See 9 L.P.R.A. § 2002 (2013).  Under the Enabling Act, PRHTA has the power to issue bonds.  9 L.P.R.A. § 2004(g), (h), (*l*).  Pursuant to the Enabling Act, PRHTA has issued certain bonds (the "PRHTA Bonds") under general bond resolutions (the "Resolutions") adopted in 1968 and 1998.  The PRHTA Bonds are secured by a gross lien on (i) revenues derived from PRHTA's toll facilities (the "Toll Revenues"); (ii) gasoline, diesel, crude oil, and other excise taxes levied by the Commonwealth pursuant to, among other laws, Act No. 34-1997, Act No. 1-2011, and Act No. 1-2015 (the "Excise Taxes"); and (iii) motor vehicle license fees imposed under, among other laws, Act No. 22-2000 (the "Vehicle Fees", and together with the Excise Taxes and the Toll Revenues, the "PRHTA Pledged Funds").  PRHTA's rights and powers under the Enabling Act include the right and power to secure the PRHTA Bonds by its pledge to the bondholders of the Toll Revenues and other PRHTA Pledged Funds.  See 9 L.P.R.A. § 2004(*l*).  The Resolutions require PRHTA to transfer the Toll Revenues and the other PRHTA Pledged Funds to the fiscal agent (the "Fiscal Agent") for the PRHTA Bonds on a monthly basis.  See Ex. C (PRHTA Res. 68-18) § 401; Ex. D (PRHTA Res. 98-06) § 401.

PRHTA Bonds are non-recourse bonds, payable solely from the Toll Revenues and other PRHTA Pledged Funds.  Thus the Emergency Orders divert the only source of bond payments.  Moreover, because PRHTA Bonds are secured by a "gross lien" on all of the Toll

Revenues and other PRHTA Pledged Funds, contrary to the Emergency Orders, operating expenses of PRHTA may only be paid *after* PRHTA satisfies its debt service and reserve fund requirements with respect to PRHTA Bonds. See Ex. C §§ 401, 601-02; Ex. D §§ 401, 601-02.

Net of reinsurance, Assured has insured approximately $1.2 billion of PRHTA Bonds currently outstanding. Under its insurance agreements and insurance policies, Assured is deemed to be the sole holder of PRHTA Bonds for purposes of exercising all rights and remedies of PRHTA Bondholders. See, e.g., Ex. E (Insurance Agreement for PRHTA Series AA Bonds) § 1(g); Ex. F (Insurance Agreement for Series L Bonds) § 4; Ex. G (Insurance Agreement for PRHTA Series N Bonds) § 5. In addition, Assured is recognized as a third-party beneficiary under the Resolutions. See, e.g., Ex. E § 1(k); Ex. F § 6.

### III.    The Subordinated GDB Lines Of Credit

In addition to its indebtedness on account of PRHTA Bonds, PRHTA is indebted to Respondent GDB with respect to certain lines of credit (the "Subordinated GDB Lines of Credit") whose repayment is subordinated to the repayment of PRHTA Bonds. For example, the 2010 official statement for the PRHTA Bonds states that "[PRHTA] has financed some of its recent capital expenditures and working capital requirements with Government Development Bank lines of credit, **the repayment of which is subordinate to the [PRHTA Bonds].**"[1]

### IV.    The Recovery Act

On June 28, 2014, the Commonwealth enacted the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act"), which enabled certain of the Commonwealth's public corporations to implement a recovery or restructuring plan for their debt. On February 6, 2015, this Court held that the Recovery Act was preempted by

---

[1]    See Highway Revenue Refunding Bonds Offering Official Statement at 32 (June 17, 2010), http://www.gdb-pur.com/investors_resources/documents/PRHighwayaFIN_000.pdf (emphasis added).

Section 903(1) of the Bankruptcy Code.  The U.S. Circuit Court of Appeals for the First Circuit and U.S. Supreme Court affirmed.  <u>Franklin Cal. Tax-Free Tr. v. P.R.</u>, 85 F. Supp. 3d 577, 595 (D.P.R.) ("<u>Franklin I</u>") (emphasis omitted), <u>aff'd</u>, 805 F.3d 322 (1st Cir. 2014) ("<u>Franklin II</u>"), <u>aff'd</u>, 136 S. Ct. 1938 (2016) ("<u>Franklin III</u>").

## V.     **The Clawback Order**

On November 30, 2015, the Governor of the Commonwealth, Respondent Hon. Alejandro García Padilla (the "<u>Governor</u>"), issued Administrative Bulletin No. OE-2015-046 (the "<u>Clawback Order</u>").  The Clawback Order directs the Puerto Rico Department of Treasury to withhold the Excise Taxes and Vehicle Fees (but not the Toll Revenues that are the subject of this action) for application to the Commonwealth's "public debt" (including general obligation bonds) instead of releasing such PRHTA Pledged Funds for application to the PRHTA Bonds.[2]

## VI.     **The Moratorium Act**

On April 6, 2016, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act No. 21-2016 (the "<u>Moratorium Act</u>"), which authorizes the Governor to declare states of emergency with respect to a number of Puerto Rico public entities, including PRHTA.  The Moratorium Act delegates the Commonwealth's police power to the Governor, expressly stating that "pursuant to the Commonwealth's police powers, we the Legislative Assembly of the Commonwealth of Puerto Rico have resolved to provide the Governor with powers to declare a state of emergency for the Commonwealth and its instrumentalities."[3]

---

[2]     In a related action pending before this Court, Movants have asserted that the Clawback Order violates the Contracts Clause and Takings Clause of the United States Constitution (the "<u>U.S. Constitution</u>").  <u>See</u> <u>Assured Guar. Corp. v. García Padilla</u>, No. 16-cv-01037 (D.P.R. Jan. 7, 2016), ECF No. 1.

[3]     Ex. H (Moratorium Act) at 53 (¶ F) (emphasis added); <u>see</u> <u>also</u>, <u>e.g.</u>, Ex. H § 201(b)(iv) ("[T]he Governor may take any and all actions that are reasonable and necessary . . . to protect the health, safety and welfare of the residents of the Commonwealth").

In particular, Section 201(d) of the Moratorium Act provides that "[i]f ordered by the Governor during the emergency period created by this section, the following obligations may be suspended or modified, if applicable, until the end of the covered period, without the need for further legislation, — ii. any statutory or other obligation to transfer money (or its equivalent) to pay or secure any covered obligation (or take any action in furtherance thereof)[.]"  Ex. H § 201(d).  Furthermore, Section 201(b) of the Moratorium Act generally provides for a stay of any actions to recover on the "Covered Obligations" of a Puerto Rico public entity with respect to which a state of emergency has been declared.  The Moratorium Act defines "Covered Obligation" to include "any interest obligation [or] principal obligation."  Ex. H § 103(*l*).

On May 5, 2016, Act No. 40-2016 was enacted.  Act No. 40-2016 amended Section 108 of the Moratorium Act to provide:

> SECTION 108.    It is the Legislative Assembly's finding that, given the Commonwealth's ongoing fiscal crisis, during this extraordinary emergency period the Government should prioritize the payment of essential services over debt service not only to provide for the health, safety and welfare of the residents of the Commonwealth but also to avoid a further economic downturn and fiscal and humanitarian crisis that would ultimately materially worsen the creditor's [*sic*] recovery on their Puerto Rico Bonds. **This includes prioritizing the safety, soundness and stability of depositary financial institutions, protecting their deposits**.

Ex. I (Act No. 40-2016) § 9 (emphasis added).  Act No. 40-2016 defines GDB as a "depositary institution."  Ex. I § 9(kk).  Therefore, under the Moratorium Act as amended by Act No. 40-2016, payments to GDB qualify as payments for "essential services" that have priority over debt service, including on PRHTA Bonds.[4]  This allows the junior PRHTA creditor GDB to receive payments from Toll Revenues ahead of senior secured PRHTA Bondholders.

---

[4]    Other actions and motions pending before this Court, to which Movants are not a party, assert that the Moratorium Act is preempted by the Bankruptcy Code and unconstitutional.  See Brigade Leveraged Cap. Structures Fund Ltd. v. García Padilla., No. 16-cv-01610 (D.P.R. Apr. 4, 2016), ECF No. 1 (the "Brigade Action"); Nat'l Pub. Fin. Guar. Corp. v. García Padilla, No. 16-cv-02101 (D.P.R. June 15, 2016), ECF

VII.    **The Emergency Orders**

On May 17, 2016, pursuant to the Moratorium Act, the Governor issued Administrative Bulletin No. OE-2016-018 ("EO-18") (Ex. J), declaring a state of emergency with respect to PRHTA.  EO-18 orders the suspension of all obligations of PRHTA to transfer Toll Revenues to the Fiscal Agent.  Ex. J at 5.  EO-18 further authorizes PRHTA to utilize the Toll Revenues for the provision of "essential services for the protection of the health, security, and well-being of the residents of the Commonwealth."  Ex. J. at 5-6.  Pursuant to Section 201(b) of the Moratorium Act, EO-18 also orders that no actions will be commenced and no claims or proceedings will be started or continued in any court related to or arising under a Covered Obligation of PRHTA, including actions or proceedings related to PRHTA Bonds.

On June 30, 2016, shortly after the enactment of PROMESA,[5] the Governor issued Administrative Bulletin No. EO-2016-30 ("EO-30") (Ex. K), which extends the emergency period for PRHTA through the entirety of the "covered period," which the Moratorium Act defines to mean through and including January 31, 2017, subject to a possible two-month extension by the Governor.  See Ex. H § 103(m).  EO-30 also suspends payment of all debt obligations of PRHTA under the Resolutions that come due during the covered period, except for payments that can be made from funds on deposit with the Fiscal Agent.  Ex. K at 2.

Also after PROMESA was enacted into law on June 30, 2016, the Governor issued Administrative Bulletin No. EO-2016-31 ("EO-31") (Ex. L).   EO-31 continues the suspension of PRHTA's obligations under the Resolutions to transfer Toll Revenues to the Fiscal

---

No. 1 (the "National Action"); Trigo Gonzalez v. García Padilla, No 16-cv-02257 (D.P.R. June 30, 2016), ECF No. 1; Peaje Invs. LLC v. García Padilla, No. 16-cv-02365 (D.P.R. July 18, 2016), ECF No. 1.

[5]    See, e.g., Nick Brown, "Puerto Rico authorizes debt payment suspension; Obama signs rescue bill," Reuters (June 30, 2016, 7:16 PM), http://www.reuters.com/article/us-puertorico-debt-idUSKCN0ZG09Y ("Puerto Rico authorized suspension of payments on its general obligation debt on Thursday **just minutes after U.S. President Barack Obama signed a law creating a federal oversight board** with authority to negotiate the restructuring of the island's $70 billion in debt.") (emphasis added).

Agent.  Ex. L at 3.  Remarkably, EO-31 does *not* suspend or modify PRHTA's obligation to transfer revenues pledged for the payment of the Subordinated GDB Lines of Credit, and, instead, only modifies  PRHTA's obligation to GDB to the extent necessary to provide PRHTA with the revenues it requires to fund operating expenses or "essential services."  Ex. L at 3. Accordingly, the Emergency Orders do not suspend payments by PRHTA to GDB.  The net result is that the Emergency Orders authorize PRHTA to divert Toll Revenues to the payment of subordinated PRHTA operating expenses or "essential services," which may include payments to the insider affiliate GDB.  The Moratorium Act and Emergency Orders thus unlawfully prioritize payment to GDB of junior debt and other amounts masquerading as "essential services" ahead of payments to the senior secured PRHTA Bonds, and permit the unlawful diversion of Toll Revenues for those purposes.

## VIII.   The Enactment Of PROMESA

On  June 30, 2016, President Barack Obama signed PROMESA into law. PROMESA provides the Commonwealth and its instrumentalities with various bankruptcy-like protections, and many provisions of PROMESA are closely modeled on provisions of the Bankruptcy Code.  Specifically, Section 405(b) of PROMESA is modeled on the Bankruptcy Code's "automatic stay" provision (11 U.S.C. § 362(a)) and operates as a stay (the "PROMESA Stay") of certain actions to enforce PRHTA's financial obligations incurred prior to the date of PROMESA's enactment.

As set forth below, PROMESA has several provisions both preempting legislation and executive orders that unlawfully alter the rights of bondholders and prohibiting the transfer of funds between governmental entities out of the ordinary course of business.  The Moratorium Act and Emergency Orders are preempted by PROMESA and Section 903(1) of the Bankruptcy Code.  In addition, they violate both PROMESA's prohibition of transfers and the Contracts and

Takings Clauses of the U.S. and Commonwealth Constitutions.  The PROMESA Stay should therefore be lifted so that Movants can file and prosecute the Proposed Complaint.

## IX.    **The Bankruptcy Code Preempts The Moratorium Act**

Section 903(1) of the Bankruptcy Code provides that "a State law prescribing a method of composition of indebtedness of [a] municipality may not bind any creditor that does not consent to such composition[.]"  11 U.S.C. § 903(1).  The Moratorium Act is a "State" law for purposes of Section 903(1), because "Puerto Rico is . . . a 'State' for purposes of the [preemption] provision [i.e., Section 903(1)]."  Franklin III, 136 S. Ct. at 1946.  Furthermore, the Moratorium Act is a law "prescribing a [non-consensual] method of composition of indebtedness" for purposes of Section 903(1).  The U.S. Supreme Court, in affirming the decision of this Court, has construed the scope of Section 903(1) broadly, holding that Section 903(1) "bars Puerto Rico from enacting its own municipal bankruptcy scheme **to restructure** the debt of its insolvent public utilities companies."  Id. at 1942 (emphasis added).  By using the broad term "restructure," the Supreme Court indicated that Section 903(1) preempts any non-consensual state law modification to the contractual terms of a debt.  See, e.g., Comair, Inc. v. Air Line Pilots Ass'n (In re Delta Air Lines, Inc.), 359 B.R. 491, 498 (Bankr. S.D.N.Y. 2007) ("Restructuring means changing or in some cases even eliminating the contractual rights of creditors and contract counter-parties.").  Diverting pledged Toll Revenues is plainly a material adverse change in the contract rights of PRHTA Bondholders.

This Court in Franklin I held that the Recovery Act was preempted by Section 903(1) because it "create[d] procedures for indebted public corporations to **adjust** or discharge their obligations to creditors" by permitting an eligible public corporation to "'seek debt relief from its creditors,' . . . through 'any combination of amendments, **modifications**, waivers, or exchanges,'" and because it "permit[ted] an eligible public corporation 'to defer debt

repayment and to decrease interest and principal' owed to creditors." 85 F. Supp. 3d at 597 (emphasis added; citations omitted). The Moratorium Act authorizes the Governor to order many of the same types of debt "adjustments" and "modifications" that led this Court to conclude that the Recovery Act fell within the scope of Section 903(1). In particular, the Moratorium Act authorizes the Governor to order deferrals of debt payments, as the Governor did with respect to PRHTA Bonds under EO-30.

This Court's broad reading of Section 903(1) is in keeping with prior case law classifying as "compositions" restructurings that involved "later maturity dates" and "extensions of time for payment," even though they did not expressly provide for the discharge of debt. See, e.g., U.S. Trust Co. of N.Y. v. N.J., 431 U.S. 1, 27-28 (1976) (describing a "plan for the composition of creditors' claims" and a "composition plan" that did not discharge principal and instead merely provided for "lower interest rates and **later maturity dates**") (emphasis added); SEC v. Am. Trailer Rentals Co., 379 U.S. 594, 614 (1965) (referring to "[s]imple' compositions" under which "the adjustment of . . . debt is relatively minor, consisting, for example, **of a short extension of time for payment**.") (emphasis added).

Respondents have claimed in the Brigade Action and in the National Action that the Moratorium Act is not preempted by the Bankruptcy Code because it merely defers payments for a limited period of time, citing Ropico, Inc. v. City of N.Y., 425 F. Supp. 970, 975 (S.D.N.Y. 1976), and other cases. Aside from the lack of substance of that argument in those actions, in this case the present and ongoing appropriation and diversion of Toll Revenues on which PRHTA Bondholders have a senior lien makes clear that the Moratorium Act and Emergency Orders have already effected a serious, and permanent, adverse modification of the secured rights of Assured and PRHTA Bondholders.

## X.    PROMESA Preempts The Emergency Orders

Section 4 of PROMESA provides that "[t]he provisions of [PROMESA] shall prevail over any general or specific provisions of territory law, State law, or regulation that is [*sic*] inconsistent with [PROMESA]." 130 Stat. 551. PROMESA also contains a number of specific provisions that expressly preempt the Emergency Orders.

### A.    Section 303(3) Of PROMESA Preempts The Emergency Orders

Section 303(3) of PROMESA expressly preempts "unlawful executive orders" "that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that divert funds from one territorial instrumentality to another or to the territory." 130 Stat. 579. The Emergency Orders are "executive orders" that unlawfully "alter, amend, [and] modify" the rights of PRHTA Bondholders to receive payment of their PRHTA Bonds from the Toll Revenues. The Emergency Orders also (i) "divert funds" from a "territorial instrumentality" (PRHTA) to "the territory" (i.e., the Commonwealth), and (ii) authorize the "diver[sion of] funds" from "one territorial instrumentality" (PRHTA) to "another [territorial instrumentality]" (i.e., GDB). The Emergency Orders are "unlawful," because they violate (i) the Contracts and Takings Clauses of the U.S. Constitution, (ii) the Contracts and Takings Clauses of the Constitution of the Commonwealth (the "Commonwealth Constitution"), and (iii) Puerto Rico law.

#### 1.    The Emergency Orders Violate The U.S. Constitution

##### a.    The Emergency Orders Violate The U.S. Contracts Clause

The Contracts Clause of Article I of the U.S. Constitution (the "U.S. Contracts Clause") provides that "**[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]**" U.S. Const. art. I, § 10, cl. 1 (emphasis added). In passing the Moratorium Act, the Commonwealth "passed" a "law." In addition, in issuing the Emergency Orders, the

Governor exercised the Commonwealth's police power as delegated to the Governor under the Moratorium Act. The police power is a legislative power. See, e.g., P.R. Const. art. II, § 19 ("The power of the **Legislative Assembly** to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively.") (emphasis added). Therefore, the Governor's issuance of the Emergency Orders, as an exercise of the Commonwealth's police power, constituted a legislative act that likewise effected a change in Commonwealth law.

To determine whether a state law's impairment of a contractual relationship is sufficiently "substantial" to implicate the U.S. Contracts Clause, courts look to whether the impaired rights were the seller's "central undertaking" in the contract and whether the impaired rights "substantially induced" the buyer to enter into the contract. Franklin I, 85 F. Supp. 3d at 607. In this case, the issuance of the Emergency Orders pursuant to the Moratorium Act substantially impaired the contractual rights of Movants and PRHTA Bondholders, because PRHTA's central contractual undertaking in issuing the PRHTA Bonds was to pay the PRHTA Bonds exclusively (and only) from certain revenues, including the Toll Revenues, pledged for that purpose, and it was this pledge of particular revenues to payment of PRHTA Bonds that substantially induced PRHTA Bondholders to purchase the bonds and Movants to insure them.

Moreover, the Commonwealth covenanted with holders of PRHTA Bonds in the Enabling Act that it would "not limit or restrict the rights or powers . . . vested in [PRHTA by the Enabling Act] until all [PRHTA Bonds] at any time issued, together with the interest thereon, are fully met and discharged." 9 L.P.R.A. § 2019. By, among other things, limiting PRHTA's "right and power" to fulfill the terms of its pledge of Toll Revenues to the payment of PRHTA Bonds as authorized under the Enabling Act, the Moratorium Act impairs the Commonwealth's covenant with PRHTA Bondholders. See, e.g., Franklin I, 85 F. Supp. 3d at 605 (finding that the

Recovery Act impaired the Commonwealth's guarantee "that it would not 'limit or alter the rights or powers vested in [the Puerto Rico Electric Power Authority] until all such bonds at any time issued, together with any interest thereon, are fully met and discharged.'") (citation omitted).    Thus, the Moratorium Act, as implemented through the Emergency Orders, substantially impaired the contractual relationships between (i) PRHTA and PRHTA Bondholders, and (ii) the Commonwealth and PRHTA Bondholders.

Where, as here, the impairment of a public contract operates for a state's or the Commonwealth's benefit, "deference to a legislative assessment of [the] reasonableness and necessity [of the impairment] is not appropriate because the State's [or Commonwealth's] self-interest is at stake." U.S. Trust, 431 U.S. at 26.  In this case, the diversion of Toll Revenues pursuant to the Emergency Orders to fund (i) PRHTA operating expenses that are contractually subordinated to PRHTA Bonds and (ii) so-called "essential services" defined to include payments to insider affiliate GDB, is not a reasonable or necessary means of serving an important public purpose.

The Commonwealth's appropriation of the Toll Revenues ostensibly to finance "essential services" is particularly egregious in view of the fact that PRHTA is a corporate entity separate and distinct from the Commonwealth and does not share the Commonwealth's obligation to generally protect the health, security, and well-being of the residents of the Commonwealth.  And there is no justification, other than unlawful insider dealing, for the Moratorium Act to classify payments to GDB as an "essential service."

The Commonwealth also had many more reasonable alternatives for dealing with its economic difficulties and those of PRHTA and GDB.  The Commonwealth and PRHTA could have addressed PRHTA's  economic difficulties by, among other things:

- Suspending payment of PRHTA's junior debts to the economically distressed insider affiliate GDB, rather than permitting payment of PRHTA Pledged Funds to GDB.

- Reducing PRHTA expenditures.

- Increasing Toll Revenues by raising tolls and adding previously untolled roads to the PRHTA toll system.

- Negotiating a consensual restructuring of PRHTA's debt, similar to the recently-negotiated restructuring of the debts of the Puerto Rico Electric Power Authority.

The Commonwealth could have addressed its own economic difficulties by, among other things:

- Adjusting its budget in accordance with the "priority guidelines" set forth in Puerto Rico's Management and Budget Office Organic Act, Act No. 147-1980, by reducing expenditures for low-priority items, including, without limitation, (i) commitments contracted by the Commonwealth under special appropriations and (ii) the construction of capital works. See 23 L.P.R.A. § 104(c)(4)-(5).

- Raising additional revenues, as required by the Commonwealth Constitution in a fiscal year in which appropriations exceed estimated resources. See P.R. Const. art. VI, § 7.

- Improving revenue collections.

- Negotiating a consensual restructuring of the Commonwealth's debt.

The Commonwealth and GDB could have addressed GDB's financial difficulties by, among other things:

- Placing GDB into receivership, as provided for under GDB's charter.

- Directly providing funds to assist GDB.

- Working to collect debt owed to GDB by other Puerto Rico instrumentalities in a manner consistent with existing debt priorities.

## b.    The Emergency Orders Violate The U.S. Takings Clause

The Takings Clause of the Fifth Amendment to the U.S. Constitution (the "U.S. Takings Clause") provides that **"private property [shall not] be taken for public use, without just compensation."**  U.S. Const. amend. V.  The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the U. S. Constitution.

See U.S. Const. amend. XIV, § 1.  As noted above, PRHTA Bondholders have a lien on the Toll Revenues.  See Ex. C §§ 601-02; Ex. D §§ 601-02.  A lien is a property interest protected by the Takings Clause.  See, e.g., U.S. v. Sec. Indus. Bank, 459 U.S. 70, 76-78 (1982); Armstrong v. U.S., 364 U.S. 40, 44 (1960); Louisville Jt. Stock Land Bank v. Radford, 295 U.S. 555, 589-91 (1935).  In addition, the PRHTA Bondholders have a contractual right to receive payment from the Toll Revenues, and a contractual right constitutes a form of property for purposes of the Takings Clause.  U.S. Trust, 431 U.S. at 19 n.16 ("Contract rights are a form of property and as such may be taken for a public purpose **provided that just compensation is paid**.") (emphasis added).  The Emergency Orders thus violate the U.S. Takings Clause by depriving Movants and PRHTA Bondholders of these property interests without providing Movants and PRHTA Bondholders with just compensation.

> **c.    The Stay Provisions Of The Moratorium Act And Emergency Orders Impermissibly Deny Access To The Federal Courts**

Pursuant to Section 201(b) of the Moratorium Act, the Emergency Orders purport to prohibit the commencement or continuation of all actions, claims, and proceedings "in any court of whatever jurisdiction" that are "related to" PRHTA Bonds.  Ex. H § 201(b).  Generally, state courts cannot stay actions in federal court.  Donovan v. City of Dall., 377 U.S. 408, 412-413 (1964); accord Baker by Thomas v. GM Corp., 522 U.S. 222, 236 n.9 (1998); Gen. Atomic Co. v. Felter, 434 U.S. 12, 16 (1977).  By the same token, state or Commonwealth laws and executive orders cannot stay federal court proceedings, nor can such local laws stay federal constitutional claims filed in federal court.  The Emergency Orders are therefore "unlawful" executive orders subject to preemption under Section 303(3) of PROMESA.

2.    **The Emergency Orders Violate The Commonwealth Constitution**

The Emergency Orders violate the Contracts and Takings Clauses[6] of the Commonwealth Constitution for the same reasons they violate the Contracts and Takings Clauses of the U.S. Constitution.

3.    **The Emergency Orders Violate Puerto Rico Law**

As noted above, the Emergency Orders breach the Commonwealth's statutory covenant with PRHTA Bondholders in the Enabling Act "that it will not limit or restrict the rights or powers . . . vested in [PRHTA by the Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 9 L.P.R.A. § 2019. The Emergency Orders also violate several other provisions of the Enabling Act and of the Resolutions, including the provision of the Enabling Act authorizing PRHTA to determine the use of Toll Revenues (9 L.P.R.A. § 2012(e)(2)); the provision of the Enabling Act authorizing PRHTA to pledge Toll Revenues to payment of PRHTA Bonds (9 L.P.R.A. § 2004(*l*)); and the provisions of the Resolutions that in fact pledge Toll Revenues to payment of PRHTA Bonds (Ex. C § 601; Ex. D § 601). The Emergency Orders are "unlawful" under Puerto Rico law because they violate these and other provisions of the Enabling Act and of the Resolutions, and as such they are preempted by Section 303(3) of PROMESA.[7]

---

[6]    The Contracts Clause of the Commonwealth Constitution provides that "[n]o laws impairing the obligation of contracts shall be enacted." P.R. Const. art. II, § 7. The Takings Clause of the Commonwealth Constitution provides that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law." P.R. Const. art. II, § 9.

[7]    To the extent Respondents may argue that Movants' claims under the Commonwealth Constitution or Puerto Rico law should be subject to abstention under Pennhurst St. Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984), or otherwise, that argument is precluded by PROMESA's express grant of federal court jurisdiction to review and set aside unlawful executive orders.

**B.**    **Section 204(c)(3) of PROMESA Preempts EO-30 And EO-31**

Section 204(c)(3)(A) of PROMESA prohibits the Commonwealth from "enact[ing] new laws that either permit the transfer of any funds or assets outside the ordinary course of business or that are inconsistent with the constitution or laws of the [Commonwealth] as of the date of enactment of [PROMESA]" during the period (the "Gap Period") between the enactment of PROMESA and the appointment of all members and the chair of the PROMESA oversight board (the "Oversight Board"). 130 Stat. 572. Based on available public information, EO-30 and EO-31 were issued shortly after PROMESA was enacted into law through the President's signature. The Governor's issuance of EO-30 and EO-31 constituted an exercise of the Commonwealth's police power, and as such was a legislative act that constituted an "enactment" of "new laws" during the Gap Period. In addition, EO-30 and EO-31 "permit the transfer of . . . funds or assets outside the ordinary course of business" and "are inconsistent with the . . . laws of [the Commonwealth] as of the date of enactment of [PROMESA]," including, specifically, 9 L.P.R.A. § 2012(e)(2) (authorizing PRHTA to determine the use of Toll Revenues by resolution); 9 L.P.R.A. § 2019 (providing that the Commonwealth shall not limit or restrict the rights or powers vested in PRHTA by the Enabling Act until all PRHTA Bonds have been discharged); and Ex. C § 601, Ex. D § 601 (pledging Toll Revenues to the payment of the PRHTA Bonds). EO-30 and EO-31 are therefore also preempted by Section 204(c)(3)(A) of PROMESA.

**C.**    **Section 407 Of PROMESA Protects Movants Against Transfers Made Under The Emergency Orders**

Section 407 of PROMESA protects creditors from inter-debtor transfers like those effected under the Emergency Orders, as follows:

(a) PROTECTION OF CREDITORS.—While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a

valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property.

(b) ENFORCEABILITY.—A creditor may enforce rights under this section by bringing an action in the United States District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405, unless a stay under title III is in effect.

13 Stat. 592.

An Oversight Board for Puerto Rico came into existence upon enactment of PROMESA pursuant to Section 101(b)(1) of PROMESA. The Emergency Orders permit the withholding and transfer of Toll Revenues in violation of applicable law (i.e., the Enabling Act and Resolutions) under which Movants and the PRHTA Bondholders have a valid pledge of, security interest in, and lien on the Toll Revenues. The Emergency Orders also deprive PRHTA of Toll Revenues in violation of applicable law requiring PRHTA to deposit the Toll Revenues with the Fiscal Agent for the benefit of PRHTA's bondholders. See Ex. C § 401; Ex. D § 401.

Under Section 407(a) of PROMESA, any recipients of Toll Revenues transferred pursuant to the Emergency Orders following the enactment of PROMESA, including the Commonwealth and GDB, are therefore liable to Movants and PRHTA Bondholders for the value of the Toll Revenues so transferred. In this case, due to the extreme financial distress of the Commonwealth and of GDB, which the Commissioner of Financial Institutions and Judge Fusté, formerly of this Court, have characterized as "insolvency," the remedy of a subsequent action at law to recoup Toll Revenues from the Commonwealth or GDB is plainly inadequate, and thus an injunction to restrain such payments is necessary and appropriate.

## **ARGUMENT**

## I.    **"Cause" Exists To Lift The PROMESA Stay Under Section 405(e)(2) Of PROMESA**

Movants respectfully submit that the PROMESA Stay does not prohibit them

from filing a complaint, substantially in the form of the Proposed Complaint (Ex. B), (i) seeking a declaration that the Moratorium Act and Emergency Orders are preempted by the Bankruptcy Code and by PROMESA and invalid under the U.S. Constitution and (ii) seeking to enforce their rights under Section 407(a) of PROMESA.  To the extent the PROMESA Stay might be said to apply, cause exists to lift the PROMESA Stay pursuant to Section 405(e)(2) of PROMESA for purposes of allowing Movants to file the Proposed Complaint and prosecute the resulting action. Section 405(e)(2) provides that "[o]n motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, for cause shown, shall grant relief from [the PROMESA Stay]."  130 Stat. 589.  Notably, under Section 405(e)(2), the Court "*shall* grant relief from" the PROMESA Stay "for cause shown," meaning that relief from the stay is mandatory upon a showing of "cause."

As set forth above, the PROMESA Stay is modeled on the automatic stay provided in Section 362 of the Bankruptcy Code. 11 U.S.C. § 362(a).[8]  The automatic stay under the Bankruptcy Code can be lifted "for cause" pursuant to Section 362(d)(1) of the Bankruptcy Code, just as the PROMESA Stay can be lifted "for cause" pursuant to Section 405(e)(2) of PROMESA.  Neither statute defines "cause," but "generally speaking, 'cause' is said to exist when the harm that would result from a continuation of the stay would outweigh any harm that might be suffered by the debtor or the debtor's estate if the stay is lifted." Peerless Ins. Co. v. Rivera, 208 B.R. 313, 315 (D.R.I. 1997) (citing Marder v. Turner (In re Turner), 161 B.R. 1, 3 (Bankr. D.Me. 1993); see In re Montgomery, 285 B.R. 345, 346 (Bankr. D.R.I. 2002) (same). Similarly, the court in In re Turner stated that "[c]ause may exist for lifting the stay whenever the

---

[8]    Section 362(d) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay  . . . for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1)

stay harms the creditor and lifting the stay will not **unduly** harm the debtor[.]"  161 B.R. at 3 (emphasis added).   Among the specific factors that courts have considered when determining whether cause exists to lift the stay, the most relevant here are (i) the harm to the party seeking relief from the stay if the stay is not lifted, (ii) the harm to the debtor (i.e., PRHTA) if the stay is lifted, and (iii) the interests of creditors.   Peerless Ins., 208 B.R. at 315; C & A, S.E. v. P.R. Solid Waste Mgmt. Auth., 369 B.R. 87, 95 (D.P.R. 2007) (noting "[t]he party moving for the automatic stay to be lifted need not prove a plurality of these factors" and "[c]ourts will generally rely '[o]n only a few factors to determine that sufficient cause exists to lift the [automatic] stay'").

Here, the harm to Movants and the PRHTA Bondholders from the continuation of the PROMESA Stay clearly outweighs any harm to the Respondents from having the stay lifted. If the PROMESA Stay is not lifted, the Respondents' diversion of the Toll Revenues pursuant to the Emergency Orders will inevitably result in defaults on the PRHTA Bonds and claims on the insurance policies issued by Movants with respect to those bonds, which will in turn result in economic harm to Movants.

By contrast, lifting the stay to allow Movants to seek the invalidation of the Emergency Orders will not "unduly" harm the Respondents (In re Turner, 161 B.R. at 3), because the Respondents have no right to the Toll Revenues in any case.   Courts have long held that funds pledged to the payment of municipal bonds are held in trust by the municipality for the benefit of the bondholders and in that sense are no longer property of the municipality, i.e., PRHTA.   See, e.g., In re Colum. Falls, Mont. Special Imp. Dist No. 25, 143 B.R. 750, 762 (Bankr. D. Mont. 1992) (holding that revenues pledged to the payment of municipal bonds were "trust funds" with respect to which the chapter 9 debtor was "'merely a custodian'") (citation omitted); see also, e.g., Cty. & Cnty. of Dall. Levee Imp. Dist. ex rel. Simond v. Indus. Props. Corp., 89 F.2d 731, 733 (5th Cir. 1937) (revenues collected for servicing bonds "are simply held

in trust for the purposes . . . of paying the interest and the principal of the bonded indebtedness."); <u>Bexar Cnty. Hosp. Dist. v. Crosby</u>, 327 S.W.2d 445, 448 (Tex. 1959) (holding that taxes levied to retire certain bonded indebtedness were held in trust for the bondholders and could not be applied to any purpose except the bonded indebtedness); <u>Bedell v. Lassiter</u>, 196 So. 699, 700 (Fla. 1940) (holding that taxes levied and collected to secure payment of bonds constitute a trust fund for the benefit of bondholders); <u>Hays v. Isaacs</u>, 120 S.W2d 737, 738 (Ky. 1938) (fund dedicated to the repayment of bonds "is a trust for the benefit of the holders of the bonds" and cannot be diverted to another purpose).

The fact that PRHTA holds the Toll Revenues in trust for the PRHTA Bondholders and has no beneficial interest in these funds is established by the plain terms of the Enabling Act, which gives PRHTA Bondholders the right "to require [PRHTA] to account as if it were the trustee of an express trust[.]" 9 L.P.R.A. § 2013(a)(2). Because PRHTA no longer has a beneficial interest in the Toll Revenues and instead merely holds these funds in trust for the PRHTA Bondholders, as a matter of law there is no cognizable harm to PRHTA in requiring it to pay those funds over to the Fiscal Agent, as required by the Enabling Act and the Resolutions that authorized the issuance of the PRHTA Bonds.

Moreover, creditors, such as PRHTA contractors and GDB, who are not PRHTA Bondholders will not be harmed by the lifting of the stay because such creditors have no right to receive payment from the Toll Revenues in any case and would be liable to repay such amounts (subject to collectability) pursuant to Section 407 of PROMESA following expiration of the PROMESA Stay.

"Cause" for lifting the stay also includes "lack of adequate protection of an interest in property[.]" 11 U.S.C. § 362(d)(1). A secured creditor is entitled to adequate protection if it can establish that the value of its interest in collateral is declining as a result of the

stay.  See In re SW Boston Hotel Venture LLC, 449 B.R. 156, 175 (Bankr. D. Mass. 2011).  As the Supreme Court has observed, "'[i]t is common ground that the "interest in property" referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay.'"  Id. at 175-76 (quoting United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 370 (1988)).

Here, the PROMESA Stay is clearly interfering with the right of Movants and the PRHTA Bondholders to have their "security" (i.e., the Toll Revenues) applied to accounts dedicated to the  payment of PRHTA Bonds, because so long as the PROMESA Stay remains in place, the Emergency Orders allow the PRHTA Bondholders' "security" to continue to be diverted to purposes other than payment of PRHTA Bonds.   Similarly, the "value" of the PRHTA Bondholders' interest in the Toll Revenues will continue to decline so long as the Emergency Orders allow the Toll Revenues to continue to be diverted and spent instead of properly applied to PRHTA Bonds.

As matters stand, the only collateral that Movants can be confident will be available for payment of the non-recourse PRHTA Bonds are approximately $197 million in reserve fund moneys that remain on deposit with the Fiscal Agent for the PRHTA Bonds.  The funds on deposit with the Fiscal Agent are not sufficient to pay in full more than one additional installment of principal and interest on the PRHTA Bonds (due January 1, 2017) and are grossly inadequate to pay the full $4.5 billion outstanding principal amount of the PRHTA Bonds, much less interest.   These funds on deposit with the Fiscal Agent will thus soon be completely exhausted if they are not replenished from Toll Revenues and other PRHTA Pledged Funds, as the Enabling Act and Resolutions under which the bonds were issued require.  Furthermore, although Movants and the PRHTA Bondholders have a property interest in future Toll Revenues,

these future Toll Revenues should not be viewed as fulfilling PRHTA's obligation to provide "adequate protection," so long as PRHTA and the other Respondents are improperly diverting and spending these revenues instead of properly applying them to PRHTA Bonds.  See, e.g., Magnolia Portfolio LLC v. Dye (In re Dye), 502 B.R. 47, 56-57 (Bankr. M.D. Pa. 2013) (holding that proposed future payments did not provide adequate protection where it was uncertain that the proposed payments would ever materialize); In re DB Cap. Holdings, LLC, 454 B.R. 804, 817, 823 (Bankr. D. Colo. 2011) (same).  Far from adequately "protecting" Movants' interest in the Toll Revenues, as required under Section 405(e)(2) of PROMESA, the Emergency Orders authorize PRHTA and the other Respondents to actively destroy that interest by diverting bondholder collateral for the benefit of a subordinated, insider affiliate creditor and for debts of a legally separate entity (i.e., the Commonwealth).  Accordingly, "cause" clearly exists to lift the PROMESA Stay to permit Movants to challenge Respondents' unlawful actions.

**II.      Emergency Stay Relief Is Warranted Under Section 405(g) Of PROMESA**

Pending the Court's ruling on this Motion and the resolution of Movants' challenges to the Emergency Orders, Movants are also entitled to emergency stay relief under Section 405(g) of PROMESA, which provides that "[u]pon request of a party in interest, the court, with or without a hearing, shall grant such relief from the [PROMESA Stay] as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (e) or (f)."  130 Stat. 589.

Here, immediate relief from the PROMESA Stay is necessary to prevent irreparable damage to Movants' interest in the Toll Revenues.  Under the Emergency Orders, the Respondents are appropriating and diverting to other uses Toll Revenues that should be paid over to the Fiscal Agent on a *monthly* basis.  See Ex. C § 401; Ex. D § 401.  Furthermore, PRHTA is

in financial distress, leading its auditors to express "substantial doubt about [PRHTA's] ability to continue as a going concern."[9]  Meanwhile, Judge Fusté, formerly of this Court, has stated that the Commonwealth and GDB, two of the entities to which, or for whose benefit, the Emergency Orders authorize PRHTA to transfer the Toll Revenues, are already "insolvent."  See Wal-Mart P.R. Inc. v. Zaragoza-Gómez, No. 15-CV-03018, 2016 WL 1183091, at *1 (D.P.R. Mar. 28, 2016), appeal docketed, No. 16-1406 (1st Cir. Apr. 15, 2016).

Because of the financial distress and/or outright insolvency of these Respondents, Movants will likely never be able to recover or replace any Toll Revenues withheld by PRHTA for its own use or transferred by PRHTA to or for the benefit of the Commonwealth or GDB.  As such, Movants will suffer "irreparable damage" to their interest in the Toll Revenues for each dollar that is diverted or spent pursuant to the Emergency Orders.  To prevent this imminent "irreparable damage" to Movants' interests, this Court should grant immediate, emergency relief from the PROMESA Stay to the extent necessary to prevent any further diversion or depletion of Toll Revenues.

WHEREFORE, Assured respectfully requests that the Court (i) grant emergency relief from the PROMESA Stay under Section 405(g) of PROMESA to the extent necessary to prevent irreparable damage to Assured's interest in the Toll Revenues, (ii) enter an order, substantially in the form of the Proposed Order, granting relief from the PROMESA Stay under Section 405(e)(2) of PROMESA for the purposes of permitting Assured to file a complaint substantially in the form of the Proposed Complaint and to prosecute the resulting action, and (iii) grant such other relief to Movants as the Court deems just and proper.

---

[9]    PRHTA Audited Financial Statements, Required Supplementary Information, and Supplemental Schedules for the Years Ended June 30, 2014 and 2013 at 2, http://www2.pr.gov/presupuestos/presupuesto2016-2017/Estados%20Financieros/2016_01_21%20Autoridad %20de%20Carreteras.pdf.

Dated:     San Juan, Puerto Rico
             July 21, 2016

                         CASELLAS ALCOVER & BURGOS P.S.C.

By: */s/ Heriberto Burgos Pérez*
       Heriberto Burgos Pérez
       USDC-PR 204809
       Ricardo F. Casellas-Sánchez
       USDC-PR 203114
       Diana Pérez-Seda
       USDC-PR 232014
       P.O. Box 364924
       San Juan, PR 00936-4924
       Telephone:  (787) 756-1400
       Facsimile:  (787) 756-1401
       Email:  hburgos@cabprlaw.com
              dperez@cabprlaw.com

                         CADWALADER, WICKERSHAM & TAFT LLP

By: */s/ Howard R. Hawkins, Jr.*
       Howard R. Hawkins, Jr. (admission pending)
       Mark C. Ellenberg (admission pending)
       Ellen M. Halstead (admission pending)
       200 Liberty Street
       New York, NY 10281
       Telephone:  (212) 504-6000
       Facsimile:  (212) 406-6666
       Email:  howard.hawkins@cwt.com
              mark.ellenberg@cwt.com
              ellen.halstead@cwt.com